UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARGARET ANN IVES,

      Plaintiff,

v.                              CASE NO. 3:15-cv-621-J-MCR

CAROLYN W. COLVIN, Commissioner
of the Social Security Administration,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision denying her application for a period of disability and disability insurance

benefits ("DIB").  Plaintiff initially alleged that she became disabled on April 1,

2007, but later amended her alleged disability onset date to April 1, 2008.  (Tr.

14, 42-43, 321.)  Administrative Law Judge John D. Thompson, Jr. ("ALJ

Thompson") held hearings on November 16, 2011 and November 13, 2013, at

which Plaintiff was represented by an attorney.[2]  (Tr. 37-127.)

On February 10, 2012, ALJ Thompson issued his first decision finding

Plaintiff not disabled from April 1, 2008 through the date of the decision.  (Tr. 145-

56.)  This decision was reversed and remanded by the Appeals Council on June

_____

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Docs. 13, 16.)

[2] Plaintiff was represented by Jessica Dumas at the first hearing and by James
Rhoten at the second hearing.

8, 2013.  (Tr. 162-64.)  On December 18, 2013, ALJ Thompson issued his

second decision finding Plaintiff not disabled from April 1, 2008 through June 30,

2013, the date last insured.  (Tr. 14-29.)

In reaching his second decision, which is presently under review, the ALJ

found that Plaintiff had "the following severe impairments: a history of interstitial

cystitis; osteoarthritis of the right thumb; lumbar spine degenerative disc disease;

carpal tunnel syndrome and possible fibromyalgia."  (Tr. 16.)  The ALJ also found

that Plaintiff had the residual functional capacity ("RFC") to perform a reduced

range of light work.  (Tr. 18-19.)

Plaintiff is appealing the Commissioner's decision that she was not

disabled from April 1, 2008 through June 30, 2013.  Plaintiff has exhausted her

available administrative remedies and the case is properly before the Court.  The

Court has reviewed the record, the briefs, and the applicable law.  For the

reasons stated herein, the Commissioner's decision is **REVERSED and**

**REMANDED**.

## I.    Standard

The scope of this Court's review is limited to determining whether the

Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841

F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are

supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390

(1971).  "Substantial evidence is more than a scintilla and is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff raises two issues on appeal.  First, Plaintiff argues that the ALJ erred in failing to articulate good cause for not crediting the treating opinions of Dr. Powell and Dr. Golden and in relying heavily on the outdated, non-examining opinion of the testifying consultant, Dr. Alexander.  Second, Plaintiff argues that the ALJ failed to articulate adequate reasons for not crediting her testimony and symptoms.  Defendant responds the ALJ provided good reasons, supported by substantial evidence, for assigning little weight to Dr. Golden's and Dr. Powell's opinions, and that substantial evidence supports the ALJ's finding that Plaintiff's

allegations were not entirely credible.

## A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)-(6).

Although a treating physician's opinion is generally entitled to more weight

4

than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518

(11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state

agency physicians" can outweigh the contrary opinion of a treating physician if

"that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244,

*3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ may reject any medical opinion if

the evidence supports a contrary finding."  *Wainwright v. Comm'r of Soc. Sec.

Admin.*, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam).  *See also

Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

### B.    The ALJ's Decision

The ALJ found that Plaintiff was capable of performing light work except:

> The claimant is limited to occasional pushing and pulling with her
> upper extremities and frequent pushing and pulling with her lower
> extremities; she is limited to frequent manipulative motions, including
> reaching, handling, fingering and feeling; she is able to climb ramps
> and stairs occasionally, but never climb ladders, ropes and scaffolds
> and she is otherwise limited to occasional postural maneuvers.  She
> is further limited to work in a temperature-controlled environment
> away from unprotected heights and dangerous moving machinery.
> She is to avoid concentrated exposure to vibration.

(Tr. 18-19.)  In making this finding, the ALJ discussed Plaintiff's testimony and the

medical opinions of record, including, but not limited to, the opinions of Plaintiff's

former treating urologist Rollin W. Bearss, M.D., her pain management doctors

Marla Golden, D.O. and Kenneth Powell, D.O., the consultative examiners

Timothy J. McCormick, D.O. and Robert W. Sury, M.D., and the non-examining,

testifying consultant Haddon C. Alexander, III, M.D., an internist with a sub-

specialty in rheumatology.  (Tr. 19-23.)

With respect to Dr. Golden's opinions, the ALJ stated in relevant part:

For much of the period after Dr. Bearss stopped managing the claimant's pelvic pain, Marla Golden, D.O. was the claimant's pain management physician.  The claimant typically reported pain related to her fibromyalgia, back problems and/or interstitial cystitis.  Dr. Golden regularly treated the claimant with trigger point injections, Cymbalta and with prescriptions for pain. . . . Dr. Golden's progress notes are noteworthy for the fact that she appears to conduct no real meaningful physical exam or assessment.  Her notes simply recite the claimant's subjective complaints and prescribe a course of treatment.  This being the case, it is very difficult to ascertain how she is able to complete any kind of [RFC] assessment form or evaluation.  It does not appear that Dr. Golden referred her for any care by a specialist for her urological or orthopedic related complaints or ordered any additional diagnostic testing apart from one mention regarding a referral to a urologist made in February 2010 (Exhibit 9F/2) which the claimant never followed up with due to some "insurance" concerns.

(Tr. 20.)  The ALJ continued:

The functional limitations offered by this treating source are not tied to any specific orthopedic or urological impairment as there are no abnormal neurological findings ever observed in terms of any loss of motor, reflex or sensory deprivation.  There is virtually no range of motion testing done by this medical source that can be gleamed [sic] from her own notes.  She does make references to some muscle spasms and some tenderness in her lower back on multiple occasions but, again, how are these findings to be considered disabling. [sic]  Dr. Golden routinely observes that her medications are effective and that her pain is "stable."  She is noted to experience no adverse medication side effects. . . . Why would this claimant have an inability to use her neck to look up or down especially given the fact that Dr. Golden was not treating her for any neck problems?  Why would she have difficulties with fingering or grasping objects in light of no affirmative findings concerning these matters?  The same would be true of the postural limitations that she notes in her assessment.

6

(Tr. 20-21.)

The ALJ gave "little weight" to Dr. Golden's opinions.  (Tr. 26.)  The ALJ

explained:

> The two opinions are inconsistent and they have little objective
> support.  In her first opinion, Dr. Golden stated that the claimant is
> only disabled when she has a flare-up of her interstitial cystitis
> (Exhibit 18F).  By contrast, her second opinion indicated that the
> claimant experiences constant pain that prevents her from sitting,
> standing or walking for extended periods of time despite the fact that
> this claimant has not sought additional treatment from her urologist
> since 2006 (Exhibit 17F).  There is little objective evidence to show
> such worsening of the claimant's condition such as to justify this
> more recent opinion.  Furthermore, neither opinion is well supported
> by the evidence of record.  As is discussed above, there are limited
> objective findings of problems related to the degenerative disc
> disease.  Furthermore, the claimant has indicated that she has been
> able to live and work with such interstitial cystitis since at least 1976,
> with no objective evidence that this medical condition suddenly
> worsened in 2008.

(Tr. 26-27.)

"For the same reasons," the ALJ gave "little weight" to Dr. Powell's

November 2011 and November 2013 opinions.  (Tr. 27.)  The ALJ explained:

> As with Dr. Golden's opinions, Dr. Powell's opinion is not supported
> by the objective evidence.  There are few objective findings that
> support his opinion and it appears to be based largely on the
> claimant's subjective complaints of pain.  His own treatment notes
> and the claimant's assertion that the prescribed pain medications are
> effective in improving her underlying pain are also inconsistent with
> the functional limitations offered by this treating source.  As
> already noted, the objective medical findings as detailed in this decision do
> not support the degree of functional impairment suggested in these
> residual capacity assessments.  Additionally, the claimant has not
> been referred to any orthopedist or neurologist or any other specialist

for her back pain.  The physical findings consistently fail to
demonstrate an underlying condition that could reasonably be the
basis for the debilitating back pain that she alleges.  Additionally, no
treating source has recommended or suggested the need for further
diagnostic testing to ascertain whether her orthopedic condition has
worsened.  As repeatedly observed in this decision, the claimant's
periodic claims of pain associated with her urological related disorder
are at odds with her failure to seek out any such urological treatment
in over 5-6 years.  If the claimant was indeed experiencing the kind
of urological symptoms that she alleges, it is difficult to understand
why she has not sought out more meaningful treatment for this
condition.  She apparently has the financial resources to undertake
some pain management therapy but has not sought out any
urological opinion concerning her interstitial cystitis condition. . . .
The claimant has the financial resources to participate in some
expensive pain management but is unwilling to consider going to any
urologist to evaluate her interstitial cystitis in over five years.  No
reasonable explanation has ever been forthcoming to address this
glaring inconsistency.  This same logic would also pertain to her
carpal tunnel condition.  She has not received any meaningful
treatment or therapy for this condition either.

(*Id.*)

The ALJ proceeded to give "little weight" to Dr. McCormick's opinion

"because his opinion that the claimant has significant limitations is too vague to

be of any real evidentiary value and because he does not specify what the

perceived functional limitations would be and what would be the objective medical

basis for any such functional restrictions (Exhibit 8F)."  (*Id.*)  The ALJ further

stated:

Additionally, his opinion is contrary to the weight of the other
objective and credible medical evidence.  The only abnormal findings
revealed by his one-time physical examination were some mild
reduction in the claimant's range of motion of her lumbar spine and
some tenderness to palpation.  As is discussed above, CT scans of

8

the claimant's back have shown that this is a mild condition.  Further, the tenderness is possibly a sign of her degenerative disc disease or perhaps her fibromyalgia, which as Dr. Alexander noted, should impose no limitations beyond those indicated in the assessed [RFC].

(*Id.*)

Similarly, the ALJ gave "little weight" to Dr. Sury's opinion.  (*Id.*)  The ALJ

noted:

During the examination, Dr. Sury noted mild deficits in the claimant's range of motion in her back and he noted that she had 15 of 18 fibromyalgia tender points.  He also noted that the claimant had 4/5 motor strength and that straight leg raising was negative both seated and supine.  Dr. Sury thereafter concluded that the claimant suffers from fibromyalgia, interstitial cystitis, anxiety, depression and refractory urinary urgency/frequency.  He stated that these conditions greatly limit her functional abilities but, again, he did not elaborate on any specific functional limitations (Exhibit 16F).

(Tr. 22.)  Later, when assessing the opinion evidence, the ALJ stated:

Like the opinion of Dr. McCormick, Dr. Sury's opinion was that the claimant's medical conditions greatly limit her functional abilities (Exhibit 16F).  Once again, this statement is simply too vague to be useful.  The undersigned agrees that the claimant's conditions do impose some limits on her functional abilities and, for that reason, she has been limited to less than a full range of light work; however, there are no credible objective findings that support a greater degree of functional limitation.  Therefore, little weight was given to Dr. Sury's opinion to the extent that it was inconsistent with the above [RFC] assessment.

(Tr. 27-28.)

Finally, the ALJ gave "somewhat more weight" to Dr. Alexander's opinions.

(Tr. 28.)  The ALJ summarized his opinions in relevant part:

At the previous hearing, H.C. Alexander, II, M.D., [sic] an impartial

9

medical expert in the field of internal medicine with sub-specialty in rheumatology, testified regarding his review of the claimant's medical records available at that time (Exhibits 1F-18F).  He indicated that, based on these medical records, he believed that the claimant has fibromyalgia with some chronic pain, but that such a condition imposed no functional limitation on her in terms of her ability to work.  Dr. Alexander also testified that he saw little objective evidence that the claimant has experienced continued pain problems related to her interstitial cystitis after the alleged onset date.  He noted that this condition is painful, but that these complaints of pain had been well controlled with the nerve stimulator that had been implanted into the claimant in order to control her pelvic pain.  On cross-examination, Dr. Alexander indicated that the record includes references to this condition after the implantation of the stimulator; however, he indicated that the lack of complaints afterwards shows that this treatment was largely successful.

(Tr. 22.)  Then, when explaining the weight given to Dr. Alexander's opinions, the

ALJ stated:

He is board-certified in rheumatology and internal medicine and his conclusions are fairly consistent with the records and supported by his familiarity with the disability provisions of the Social Security Act and Regulations (Exhibit 21B).  Dr. Alexander reviewed all of the medical records available as of the original hearing date so he had the benefit of a longitudinal view of the claimant's medical history.  Finally, Dr. Alexander's opinion was well supported by the objective evidence and he offered a reasonable and cogent medical explanation for the opinion that he offered, which was tied to the objective medical evidence.  For these reasons, the undersigned has given more weight to Dr. Alexander's opinion.

(Tr. 28.)

## C.    Analysis

Turning to the first issue, the Court agrees with Plaintiff that the ALJ erred

in his evaluation of the medical opinions of record.  Although an ALJ may

discount a treating physician's opinions if there is good cause to do so, in the

present case, there was no good cause to discount Dr. Golden's opinions

because the ALJ's reasons for giving these opinions little weight are not

supported by substantial evidence.

First, in rejecting Dr. Golden's opinions, the ALJ stated that Dr. Golden

"appears to conduct no real meaningful physical exam or assessment" and that

she simply recited Plaintiff's subjective complaints.  (Tr. 20.)  This statement is

contradicted by Dr. Golden's notes, which show that a physical examination was

performed consistent with the conditions for which Plaintiff was treated, and, on

many visits as part of her treatment, Plaintiff underwent myofascial release

techniques in addition to receiving injections, patches, gels, and refills and/or

samples of medications.  (*See, e.g.*, Tr. 676 (noting that a review of Plaintiff's

systems was positive for dysuria, urgency, frequency, bladder pain, anxiety and

depression secondary to pain, daytime drowsiness and insomnia, pain and

palpable spasm in the parathoracic region, among others, and that Plaintiff

underwent myofascial release techniques to the cervical, thoracic, and

lumbosacral regions with active correction of the somatic dysfunction, and was

given refills and samples of medications), 686 ("There is notable pain and

palpable spasm in the hip rotators, gluteus maximus, gluteus minimus, gluteus

medius, lumbar paraspinals, rectus abdominous, obliques, transverse

abdominals, iliopsoas, intercostals, longus coli, longus capitis, scalenes, levator

scapulae, sternocleidomastoid, splenius capitis, splenius cervicis, trapezius, serratus, rotator cuff, rhomboids, erector spinae, thoracic paraspinal muscles. There is notable pain on palpation over the [right] L5 paravertebral nerve and facet. . . . The [patient] underwent 3 units of myofascial release techniques to the above-mentioned muscle groups with good results.  Post treatment she had persistent pain on palpation over the [right] L5 paravertebral nerve and facet as well as persistent spasm in the [right] quadratus lumborum muscle.  It was decided to perform [injection] therapy."); *see also* Tr. 657 ("She is limping with knee pain and having difficulty moving. . . . There is stiffness in the knees bilaterally."), 671 ("She is ambulatory without an assistive device but is obviously moving slower and moving her head and neck en bloc."), 672 (noting "limited active range of motion in truncal rotation in the thoracic region"), 674-75, 677-85, 717 (noting "persistent pain and palpable prominence in the costovertebral junctions on the left from T3-T6 with palpable spasm . . . [,] notable pain and bony degenerative change with palpable warmth in the 1st carpal metacarpal joint," and "pain on palpation over the right L5 paravertebral nerve and facet").)

The ALJ also stated that despite "references to some muscle spasms and some tenderness in [Plaintiff's] lower back," there were "no abnormal neurological findings ever observed" and there was "virtually no range of motion testing done"

by Dr. Golden.  (Tr. 21.)  Even assuming that this statement was accurate,[3] it

appears that the ALJ was confused as to Plaintiff's impairments.  In addition to

lumbar degenerative disc disease, for which range of motion testing may be

appropriate, Plaintiff was also diagnosed with and treated for interstitial cystitis

and fibromyalgia, among other conditions.[4]

The symptoms of interstitial cystitis include pain ranging from mild

discomfort to extreme distress, urinary urgency and frequency (sometimes as

often as 60 times per day) with associated sleep disruption, suprapubic

tenderness on physical examination, and other symptoms.  *See* SSR 15-1p.

Interstitial cystitis also co-occurs with other conditions, like fibromyalgia, as in

Plaintiff's case.  *See* SSR 12-2p.  Fibromyalgia is "characterized primarily by

widespread pain in the joints, muscles, tendons, or nearby soft tissues that has

persisted for at least [three] months."  *Id.*  The pain is in all quadrants of the body

(the right and left sides of the body, both above and below the waist) and axial

skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back).  *Id.*

Fibromyalgia is also characterized by tender points both on the left and right

sides of the body and both above and below the waist, which are tested by digital

palpation.  *Id.*  The symptoms associated with fibromyalgia may result in both

---

[3] Dr. Golden's records reveal that she tested Plaintiff's range of motion.  (*See, e.g.*, Tr. 672.)

[4] The ALJ included these conditions in the list of severe impairments, even though he noted only "possible fibromyalgia."

13

exertional and nonexertional physical or mental limitations.  *Id.*

Here, Plaintiff's muscle spasms, tenderness, and pain, which on some visits was a ten on a scale of zero to ten even with medications, are extensively documented in the record.  (*See, e.g.*, Tr. 686 (noting "persistent and intractable [right low back pain] . . . , a lot of muscle spasm," continuing bladder pain, pelvic pain, and urinary retention, observing that Plaintiff was "emotionally upset and labile secondary to her pain," and there was "notable pain and palpable spasm" in multiple areas, and stating that even post treatment with myofascial release techniques, Plaintiff had persistent pain on palpation and persistent spasm, leading to the decision to perform injection therapy); *see also* Tr. 680 (noting that Plaintiff was "feeling like a new woman" with the Interstim, but continued having abdominal, pelvic, bladder, and low back pain, and there was notable pain and palpable spasm on examination), 681 ("She is in obvious distress, exhibiting pain behaviors, moving frequently, occasionally tearful."), 682 (observing a slight limp and pain behaviors in that Plaintiff was holding her lower quadrant and abdomen and walking slightly forward bent), 684-85.)

Although the medications were helping to some extent,[5] Plaintiff continued

---

[5] In discounting Dr. Golden's opinions, the ALJ noted that Plaintiff did not experience side effects from her medications.  Although there is no mention of side effects in many of the treatment notes, the lack of side effects (which is contradicted by Plaintiff's testimony) does not necessarily indicate that the medications were effective, as the ALJ seems to suggest.  Plaintiff testified at the first hearing that although her medications make her sleepy, drowsy, and dizzy, she was willing to tolerate it in order

(continued...)

to experience pain and other symptoms and her examination findings were positive, even with the multiple medications she was taking and even after she underwent myofascial release techniques.  (*See, e.g.*, Tr. 664, 684, 715 (noting pain level 10/10, "obvious distress secondary to bladder pain and back pain," and pain on palpation, and diagnosing, *inter alia*, acute exacerbation of pelvic and bladder pain secondary to interstitial cystitis).)  On this record, the ALJ's conclusion that Plaintiff's pain was stable is not supported by substantial evidence.  Moreover, given that the ALJ apparently expected to see examination findings and objective testing that are not typically associated with conditions like interstitial cystitis and fibromyalgia, it appears that the ALJ was either confused as to Plaintiff's conditions and/or did not adequately consider those conditions, which in turn compromised his consideration of the treating opinions in the record, as well as Plaintiff's subjective complaints.

For example, the ALJ questioned Dr. Golden's limitations for neck movements, fingering and grasping, as well as postural limitations.  (Tr. 21, 745.) Although the ALJ seemed to think that Dr. Golden did not treat Plaintiff for neck problems, Dr. Golden's notes reflect that she treated Plaintiff for neck, upper back, and shoulder pain, as well as fibromyalgia, which, as shown earlier, may

---

[5](...continued)
to find some relief from the unbearable pain.  (Tr. 75, 86-87.)

manifest in cervical pain.[6]  (*See, e.g.*, Tr. 665, 669, 671, 675-76, 717.)  Also, although the ALJ did not find any affirmative findings to justify Dr. Golden's restrictions for fingering or grasping objects, on examination, Dr. Golden found "notable pain and bony degenerative change with palpable warmth in the 1st carpal metacarpal joint," diagnosed, *inter alia*, "[a]cute exacerbation of right thumb pain," and recommended right thumb splint, among others.  (Tr. 659, 662, 668, 717.)

The ALJ also stated it did not appear that Dr. Golden referred Plaintiff to a neurologist, orthopedic specialist, or urologist (other than one referral to a urologist in February 2010), or ordered additional diagnostic testing.  (Tr. 20, 27.) Again, a referral to an orthopedic specialist or a neurologist may not have been necessary considering Plaintiff's conditions as a whole.  Moreover, after Plaintiff lost her insurance, she could not afford extensive diagnostic testing or seek the services of a urologist (or a similar specialist).  Plaintiff's treatment records are replete with statements that she does not have insurance, has "dramatic" financial difficulties that affect her ability to even refill her medications, and would be undergoing additional testing and/or treatment as soon as she obtains insurance.  (*See, e.g.*, Tr. 657 ("She still does not have insurance due to changes in her husband's job.  She has not been able to recheck on this Interstim or any

---

[6] Dr. Golden's notes also indicate that Plaintiff had knee and hip pain, among other conditions.

of her lab work."), 661 ("We will get her scheduled for additional therapy as soon

as she gets her insurance to kick in."), 663 ("She is still having financial difficulties

and is concerned about getting her medications. . . . She wonders about an

assistance program."), 715 ("We are hopeful that she will get onto an insurance

plan that will allow her to undergo more aggressive treatment modalities."), 717

("She is to see Dr. Harris in the near future to determine if he will take over her

prescribing since she is not able to get coverage for her medical care."), 723

("[Patient] has no insurance coverage . . . ."), 727 ("Has failed multiple types of

therapy and injections. . . . [Patient] has no insurance coverage and is having

difficulty affording medications."), 731 ("Switched [patient] to [C]elexa last month

due to [C]ymbalta cost[.]"), 733 ("[Patient] has bladder stimulator which has

malfunctioned and needs to be replaced. [Patient] has not been able to see

urology due to insurance issues. . . . [Patient] is having dramatic financial

problems and although [C]ymbalta is effective for her, she is unable to afford it.

She is interested in trying a generic."), 760 ("Wants pain management

[medications] until she gets insurance."), 917 ("[Patient] reports medications

continue to get more expensive as she has to pay for the medications out of

pocket.  Just as last month [patient] feels she is not getting adequate pain control

from current medications. . . . Options are limited as [patient] has no

[insurance]."), 923 ("Patient has been unable to fill her [O]xycodone and

[M]ethadone as she does not have insurance and the medications are

expensive."), 929 ("[Patient] is unable to obtain treatment for the [interstitial cystitis] due to lack of funds, no health insurance, and no disability."), 932 ("[Patient] continues to struggle financially. [Patient] is still appealing disability; doesn't qualify for medicaid because of her husband's income; doesn't live in Duval County so doesn't qualify for Shands treatment."), 935 ("[Patient] has no insurance so it is difficult for her to obtain treatment. [Patient] has a bladder stimulator that is no longer functioning. . . . [S]he has been unable to afford to get the EKG performed with methadone use."), 954 (noting Plaintiff "can't afford injections at this time"), 981 ("[Patient] cannot afford [N]uvigil. . . . [Patient] needs urology eval[uation] in the future."), 985 ("[Patient] has no active urologist following her due to lack of insurance coverage.").)

In light of the above-quoted records, the ALJ's statement that Plaintiff has not been referred to a urologist or for additional testing is not supported by substantial evidence.  (*See, e.g.*, Tr. 681, 715, 935, 981, 985.)  Although the ALJ seemed to acknowledge that Plaintiff had no insurance, he nevertheless questioned her motivation to address the underlying causes of her symptoms by pointing out that Plaintiff spends several thousand dollars a year for pain management visits and medications rather than spending this money on a urologist.  (Tr. 23.)  In doing so, it appears that the ALJ made several assumptions: one, that the amount of money spent on pain management could cover the services of a urologist and any necessary tests, which even the

Commissioner's own Ruling recognizes can be "complex, costly, and invasive,"

SSR 15-1p; two, that a urologist could actually address the underlying causes of

Plaintiff's symptoms better than a pain management doctor, which seems unlikely

given that Plaintiff was actually referred to pain management by her urologist (Tr.

507-08), and that "[t]reatments for [interstitial cystitis] are mostly directed at

symptom control," SSR 15-1p; and, three, that treatment by a urologist would

eliminate the need for pain management.  In any event, a claimant's inability to

afford treatment, as is the case here, excuses non-compliance with prescribed

treatment, including further diagnostic testing and referrals to other specialists.

*See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam).

Further, in discounting Dr. Golden's two opinions regarding Plaintiff's

functional limitations (*see* Tr. 742-46, 748-50), the ALJ stated that they were

inconsistent in that the second opinion was more limiting despite the fact that

Plaintiff did not see a urologist since 2006 (Tr. 26).  On December 12, 2007, Dr.

Golden completed a Family and Medical Leave Act form for Plaintiff, opining, *inter*

*alia*, that it would be necessary for Plaintiff to work only intermittently or on a less

than full schedule due to unpredictable flare-ups of interstitial cystitis and

degenerative disc disease, and that during the flare-ups, Plaintiff would be unable

to sit or stand for more than one hour.  (Tr. 748-50.)  Then, on November 15,

2011, Dr. Golden completed a Physical RFC Questionnaire, which had more

specific questions regarding Plaintiff's functional abilities.  (Tr. 742-46.)  In this

19

Questionnaire, Dr. Golden opined, *inter alia*, that Plaintiff was incapable of even low stress jobs, she could sit/stand for 10 minutes at one time, walk no blocks without rest or severe pain, sit for less than two hours, and stand/walk for less than two hours total in an eight-hour work day.  (*Id.*)

Given that Dr. Golden's second opinion was given in response to more detailed questions after she had the benefit of treating Plaintiff over the course of several years, the Court cannot say that substantial evidence supports the ALJ's conclusion that the two opinions were inconsistent.  Further, without any specifics as to why Dr. Golden's opinions had little objective support and in light of the Court's earlier discussion of the ALJ's consideration of Dr. Golden's opinions, the Court cannot conclude that the ALJ provided good cause to discount the doctor's opinions.

Based on the foregoing, the ALJ's reasons for giving Dr. Golden's opinions little weight are not supported by substantial evidence.  Therefore, this case will be reversed and remanded with instructions to the ALJ to reconsider Dr. Golden's opinions, explain what weight they are being accorded, and the reasons therefor. In the event the ALJ decides to reject any portion of Dr. Golden's opinions, the ALJ must provide good cause therefor.  In light of this conclusion and the possible change in the RFC assessment, the Court finds it unnecessary to address Plaintiff's remaining arguments.  *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3

(M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam).  However, on remand, the ALJ is directed to reconsider Dr. Powell's and Dr. Alexander's opinions, as well as Plaintiff's subjective complaints.

Plaintiff requests, in the event that the Court does not reverse for an award of benefits, that the case be reversed and remanded to a different ALJ for further proceedings.  Plaintiff points out that prior to the second hearing, she actually requested that ALJ Thompson recuse himself because of his behavior toward her at the first hearing and the effect on her health after the hearing.  (Tr. 449.)  Attorney Dumas also requested recusal because she had a pending complaint against ALJ Thompson due to his past behavior and failure to follow proper procedures in obtaining medical experts.  (Tr. 450, 452-76.)

"A claimant is entitled to a hearing that is both full and fair."  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam).  In *Miles*, the court stated:

> The ALJ plays a crucial role in the disability review process.  Not only is he duty-bound to develop a full and fair record, he must carefully weigh the evidence, giving individualized consideration to each claim that comes before him.  Because of the deferential standard of review applied to his decision-making, the ALJ's resolution will usually be the final word on a claimant's entitlement to benefits.  The impartiality of the ALJ is thus integral to the integrity of the system.

*Id.* at 1401.

A "remand to a different ALJ may be an appropriate remedy, even without

an express finding of bias." *King v. Comm'r of Soc. Sec.*, 2008 WL 4095493, *5

(M.D. Fla. Aug. 29, 2008).  For example, if there is "a clear indication that the ALJ

will not apply the appropriate legal standard on remand," has manifested

"inappropriate hostility toward any party," has refused "to consider portions of the

testimony or evidence favorable to a party, due to apparent hostility to that party,"

or refused "to weigh or consider evidence with impartiality, due to apparent

hostility to any party," remand to a new ALJ may be appropriate because the

ALJ's conduct has given "rise to serious concerns about the fundamental fairness

of the disability review process." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282,

292 (E.D.N.Y. 2004).

Given that this case has already been remanded once, that there was a

complaint against the ALJ by Plaintiff's attorney for failure to follow proper

procedures, that Plaintiff requested recusal to avoid exacerbation of her

symptoms, and this Court's direction that on remand, the ALJ should reconsider

Plaintiff's credibility in addition to the opinions of her treating doctors, the Court

believes that a remand to a different ALJ is appropriate, which will also prevent

Plaintiff from raising allegations of bias by the same ALJ in any future appeal in

this case.

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED** and **REMANDED to a**

**new ALJ** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the

ALJ to: (a) reconsider the medical opinions of record and Plaintiff's subjective complaints, as stated in this Order; (b) reevaluate Plaintiff's RFC assessment, if necessary; and (c) conduct any further proceedings deemed appropriate.

2.      The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.      In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on September 22, 2016.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record